## N. Y. SUPERIOR COURT.

THOMAS C. DURANT, respondent agt. LEWIS EINSTEIN and others, appellants.

A court of equity has no general jurisdiction over actions to redeem personal property *pawned*, without some other circumstances rendering its interference necessary.

The remedy at law is ample, by tender of the amount due and a possessory action to recover the articles pledged, or damages for their detention.

The only ground of equitable jurisdiction over an action for the redemption of personal property pledged, besides the necessity of a *discovery*, and perhaps an *assignment of the pledge*, is the necessity of *taking an account*.

It is fully settled that the *account* on which equity bases its jurisdiction must be really one; that is, not having only one item on one side and a number of set-offs on the other, but a series of transactions on both sides.

Where an action is brought to redeem certain securities in the hands of the defendants, as stock brokers, upon paying the amount due thereon, and for an injunction order restraining the defendants from selling such securities until an account can be taken of the amount due the defendants, it cannot be sustained where it appears that the claim on the part of the defendants can only consist of one item—the original advances by them, or so much of it as remains unpaid.

Every sum paid or to be credited in that account forms a subject of set-off in an action at law, even including any liability of the defendants, as alleged in the complaint, for selling any of the original pledged stock below its market price; as such liability forms a subject of counter-claim in an action for the loan, under the first subdivision of section 150 of the Code.

*Unliquidated damages*, for an entirely unauthorized sale of pledged stocks or securities, can form no part of an *account* to give jurisdiction to a court of equity.

Sales of stock below the market price, when duly authorized, would not make the brokers liable for the difference, unless made with an *intent to injure* the principal, beyond the mere regulation of the amount due the brokers, as in other cases of abuse of lawful authority. But something besides a mere sale below the market price is necessary to show such intent.

Brokers who are mere pawnees are not bound to use even the same diligence as an agent to obtain the best price. The latter would not be held liable except for extraordinary negligence, which must be proved, not presumed. There must at least be such recklessness shown in the mode or time of selling as to establish an intent to injure the pawnors, before the pawnees can be made liable for any loss.

The plaintiff is bound to make out his case affirmatively, and although this court on appeal at general term cannot properly interfere with any decision at special term, founded on conflicting evidence, it may yet do so where that on one side is mere information and belief, and that on the other positive knowledge.

Upon the evidence in this case, the plaintiff has hardly made out a clear case of sales at higher prices, or of any design by the defendants to lower the market value of the securities; and the mere fact of reporting fictitious sales is not sufficient to sustain the injunction order.

*At General Term*, 1868; *heard March* 19, 1867; *decided March 9th*, 1868.

*Before* ROBERTSON, *Ch. J.*, MONELL *and* GARVIN, *Justices*.

APPEAL from an order and decision of Justice McCUNN, at special term, August, 1867. The facts will sufficiently appear in the opinion given at special term, as follows:

McCUNN, J. This is a motion to dissolve a temporary injunction.

The defendants, on the 11th of January, 1867, agreed to carry for plaintiff ten thousand shares of the preferred stock of the Chicago and Northwestern Railroad Company, and to pay for the same at $10 (per share) less than the market value thereof, which was then $80 per share.

This agreement was to extend three months, plaintiff agreeing that, if the stock during that time fell below eighty, he should then keep in the defendants' hands a clear margin of $10 per share, and in default of his not doing so, defend-

·ants had the privilege of selling the stock at public or private sale, with or without notice.

Under this agreement defendants received the ten thousand shares, and advanced to the plaintiff thereon $700,000.

The plaintiff alleges that, by the custom of brokers and bankers and business men, the defendants should refrain from all acts that would affect the value of the stock, and that they should not do anything that would depreciate the stock in market. He also alleges that the price of the stock was to be determined by the sales made at the New York Stock Exchange, which held two sessions each day, and at the Open Board Exchange, which held three sessions each day.

Plaintiff further says that on the 20th of January the stock fell below $80 per share, and at defendants' request he deposited $80,000 as additional margin.

That on the 23d of January defendants made further calls for additional security or margin, and plaintiff then deposited with defendants one hundred land grant bonds of the Union Pacific Railway Company, Eastern Division, each of the value of $1,000, amounting in all to $100,000. These bonds the defendants agreed to accept as security, rating them at $50,000 in cash. That on the 24th of January, 1867, the defendants again called for more security, and plaintiff gave them a note for $25,000, made by the Union Pacific Rail-Road Company, together with twenty-five bonds of the company, each worth $1,000, as collateral security, and which defendants received as $25,000 in cash. (This note was paid.) That after business hours, and late on the 24th of January, plaintiff deposited with defendants, as additional security, $10,000 in cash, and sixty shares of Pacific Mail Steamship Company's stock, of the value of $10,494. All the foregoing allegations are substantially admitted by defendants' papers.

Plaintiff further says that on the close of the day of the 24th of January, he, plaintiff, had fully complied with the

contract on his part, and had requested the defendants to carry the 10,000 shares of preferred stock agreed upon.

Plaintiff further alleges that, on said 24th day of January, 1867, at about half past three o'clock, he gave notice to the defendants that next day he would take up 2,000 shares of preferred stock, and pay for the same, and would leave the whole of the additional security in defendants' hands as collateral to the remaining 8,000 shares. He also alleges that on the same day he notified defendants that next day he would take up and pay for an additional 3,000 shares of the preferred stock, or as much more as was required to make the margin perfectly secure, and would leave all the additional securities as collateral to the remaining 5,000 shares.

He also alleges that by the custom of the market he had until quarter past two, on the 25th of January, to do this, and that he was ready and willing, on the said 25th, at 11 o'clock, to do so, and notified the defendants to that effect, when defendants replied they had sold all said 10,000 shares of the preferred stock. And they thereupon rendered him an account sales, which they claim to be strictly true and accurate, and which showed a large balance in their favor, for the making good of which they claimed the right to sell the 100 land grant bonds and the 66 shares of the Pacific Mail Steamship stock pledged as before stated. Plaintiff, however, alleges this account of defendants to be incorrect and untrue. Untrue in this, that defendants sold the said preferred stock not in a legitimate way, and much below the market value. And he further says, that if the stock had been estimated at a fair market value, the margin in their hands at the time they sold his preferred stock was amply sufficient, and more than sufficient, to have enabled defendants to carry the said 10,000 shares of preferred stock.

All these allegations are absolutely and positively denied by defendants.

So that the principal question in the case is, whether the defendants acted legally and fairly in selling and disposing

Durant agt. Einstein.

of the 10,000 shares of the preferred stock of the Chicago and Northwestern Railroad Company, and under which sale they claim to have. a large balance against plaintiff, or whether they connived to break down the market value of said stock, and sold the same secretly and below its market value; and that by reason thereof he is not in their debt, and that therefore he is entitled to have an accounting, and to have returned to him the 100 land grant bonds and the 66 shares of the Pacific Mail Steamship Company's stock.

He further claims that if, after an accounting, there is any sum due by him to defendants, he is ready and willing to pay the same, and now offers to do so, and receive back his pledges.

In the meantime he prayed for and received the temporary injunction of this court, restraining the defendants from disposing of said 100 land grant bonds and said 66 shares of the Pacific Mail Steamship Company's stock.

The motion now before me is one on the part of the defendants to set aside that injunction and allow the defendants to sell and dispose of the land grant bonds and the Pacific Mail Steamship Company's stock, so as to enable defendants to satisfy the alleged balance due by plaintiff to them; and for the purposes of this motion they rely mainly on two facts:

*First.* They say that the statements presented by them are so strong and overwhelming that the court would be fully justified in dissolving the injunction.

*Second.* They allege that in a former action in the supreme court of this district, which action was discontinued before this suit was commenced, a motion was made to set aside a similar injunction, and was granted, and afterwards affirmed at general term on behalf of defendants; and they now contend that the decision on that motion by the supreme court should bind this court, or at least, in a great measure, warrant me in granting their motion here.

Unfortunately, the judges of the supreme court, both at

general and special term, assign no reasons for dissolving the injunction, and give no opinion in the case. We are therefore left uninformed as to the method or line of reasoning they adopted in disposing of the motion.

On the hearing before me, it was asserted by counsel for plaintiff, and admitted by the other side, that, at the argument at the general term of the supreme court, the justices would not allow, or, in other words, would not consider, the additional affidavits offered on the part of plaintiff to support the sworn complaint, notwithstanding the fact that the defendants had moved to set aside the injunction upon a large number of new affidavits in addition to the answer.

Now, this fact alone is enough, in my mind, to take this case, so far as this motion is concerned, without the pale of the rulings of the supreme court on the former motion. The practice in all the districts of the supreme court of this state, with the exception of the first district, and the uniform practice of this court, enables the plaintiff, where the defendant moves on a sworn answer and additional affidavits to set aside an injunction granted on a sworn complaint alone, to put in counter affidavits to support his sworn complaint.

Mr. Justice WOODRUFF, in the case of *Fowler* agt. *Burns* (7 *Bosw. R.* 637), in a most learned and able opinion, settles this question fully, and the rulings in that case must be conclusive with me in this. Counter affidavits were not allowed to be read in the proper sense of the word in the case in supreme court, and, as·I have said before, that is enough to warrant me in disregarding the course pursued by the supreme court on the result of the motion there.

Moreover, the investigation in the supreme court was, as it is in this court, entirely discretionary; and does not involve an investigation upon the merits in open court with witnesses heard, but only an investigation of a preliminary and partial character, upon affidavits.

The interlocutory proceedings of a court are of no impor-

tance, except in the suit itself. This is a preliminary trial for an injunction—an injunction *pendente lite*, not a demand for a final adjudication—and the only thing for a court to do in such a case is to determine in a summary manner whether plaintiff should have an injunction during the pendency of the action.

Again, the action in the supreme court was an action for the recovery of the original securities; alleging a fraud in respect to the preferred stock, claiming damages in a large sum of money, and praying the court for judgment that defendants hand plaintiff back his *preferred stock*.

The prayer of that complaint shows that the plaintiff demanded as final relief, that the defendants' pretended sales of the plaintiff's preferred stock be declared null and void, and that the defendants be required to return the 10,000 shares to the plaintiff and recovery of heavy damages.

That action was to get the preferred stock back again; to repudiate their sale by the defendants, and compel them to replace it; and then, that they should be compelled to surrender the other collaterals on the same ground. Plaintiff, in that action, did not offer, as he does in this, to pay them any balance, if any should be found in their favor, but claimed that they had unlawfully dealt with the preferred stock, on the ground that their transaction in it was fraudulent.

This action is brought for the recovery of the collaterals; two lots—one of bonds, and the other of Pacific mail shares —put up as a pledge or security, under a new and separate agreement; and the complaint is filed to redeem that pledge. Defendants admit that they were put in as collaterals, as pledges, and they have accordingly rendered an account. But plaintiff denies that account, and states facts going to show that that account should be investigated, in order to ascertain whether any thing is due them or not. He does not ask the stock from defendants. He asks, simply, the privilege of paying any balance found against him, and redeeming the pledged collaterals. And, to my mind, the rem-

edy he is now seeking, if the allegations in his complaint be true, is the correct remedy.

Defendants have a pledge from plaintiff for a balance. They claim that plaintiff owes $74,000 or $75,000. Plaintiff denies that it is any such sum ; but says, whatever the amount may be, he is entitled to ask that it be first ascertained by the court what he does owe, (if any thing,) in order that he may have a chance to pay it. A pledgor has a right to an account, and to have a decree of a competent court to settle the same, if that account is disputed. This he has a right to ask. (*Willard's Equity Jurisprudence*, 456. *See the numerous cases cited in notes.*)

A court of equity has always jurisdiction of such claims. A man with a pledge in his hand cannot dispose of it without regard to the pledgor's rights. He cannot be judge, jury and sheriff, when there is any dispute about the subject pledged. It is the right of the party to be heard in open court, before his property is sacrificed.

A prudent pawnee, where there is a question about the amount, gives the proper notice to the pledgor, and brings his action in equity to foreclose the pledge and have it sold, and have the amount due him determined; and in all cases where the pledgor shows that there is a question as to the amount, and wants to redeem his property, and is ready to pay, he has a right to come into a court of equity and ask the proper relief.

The rule of equity, in regard to an injunction, is this: that where the relief sought by the action will fail unless there be an injunction pending the suit, and where the plaintiff gives security, a temporary injunction should be granted, otherwise the whole object of the action fails.

The pledge of a million of dollars of Chicago and North Western Railroad preferred stock, was a pledge by a written instrument, with a waiver in it; while the pledge of the property the plaintiff is now seeking to recover was a simple

pledge, with no waiver; a new agreement, so far as these securities are concerned.

The 10,000 shares of preferred stock that plaintiff put in as the first pledge against the $700,000 was pledged with a condition and a waiver. The condition was to keep the margin good within $10 a share of the actual market of the stock. On the default of that condition, the pledge would be forfeited, and the parties rights as pledgee to enforce it would immediately arise. It may be well to examine hastily here what are the parties rights in this action, even if the defendants be correct in saying, that the land grant bonds and the Pacific Mail Stock were a part and parcel of the original contract.

In the first place, if there is no waiver in the agreement, the pledgee's rights are to demand a satisfaction, and give the party a reasonable time to make the satisfaction good, and then give him notice of sale before they sell his pledge. Without these three things he cannot sell:

*First.* There must be a demand.

*Second.* It must be a demand reasonable in time; and,

*Third.* There must be notice.

In this case the defendants testify positively there was a demand and notice, but this is as positively denied by plaintiff.

The doctrine of pledges is clear; the pledgee never can sell, unless there be a waiver, without first calling upon the party, if he is within reach, and requiring him to make his pledge good, and then giving him notice before he sells. A waiver of notice is not a waiver of demand. (*Wilson* agt. *Little*, 2 *N. Y. R.*, 443.)

In that case it was held expressly that where there was a contract, saying that a party might sell without notice, it did not authorize a sale without a demand, and without calling on the party to fulfill. The borrower agreed that the vendor could sell without notice, but not that he could sell without demand of payment; and the law of this court is, that where

there was a waiver of the notice only, a demand was not waived.

The rule that a demand is necessary, notwithstanding the waiver of notice, is held also in *Lewis* agt. *Varnum* (12 *Abbott Pr. Rep.*, 305), and in the very recent case of *Genet* agt. *Howland* (45 *Barbour Rep.*, 560). The notice given was not equivalent to a demand. The demand must be a requirement to pay and redeem, and a reasonable time for payment and redemption must be allowed.

In *Milliken* agt. *De Bow* (27 *N. Y. R.*, 364), there was a consignment of cotton, and the consignor was to keep the margin good; and it was held that the consignee could not sell in that case; that he must demand the margin before selling. He had leave by contract to sell without notice; but that was not enough. Demand was not waived. The question in that case was, whether a demand was necessary, and the necessity was declared by the court.

In *Andrews* agt. *Clarke* (3 *Bosworth Rep.*, 585), it was held, that the plaintiff was not in default, so that the defendant had a right to sell, though they had given him notice that they anticipated a fall on a certain day; that the pledgee could not sell without the fall first occuring, and then giving him notice, so as to cut off his equity of redemption.

In *Merwin* agt. *Hamilton* (2 *Duer Rep.*, 244, 251), the pledgees were held liable because they did not make demand of judgment and give notice of sale. It is clear, therefore, that a party in default, without any special arrangement, is entitled to two things:

*First.* His property cannot be sold at the will of the pledgees without their first making a demand upon him, in order that he may be enabled to prevent its being sacrificed; and,

*Second.* He is entitled to notice of sale.

But if demand and notice were both complied with, and before the sale the plaintiff places himself in a position to tender his money and redeem his pledge, that is enough to entitle him to its return.

In a case of this magnitude, where a plaintiff charges on the oath of serveral persons, that all his property was ear-marked by having his own special power attached, and that through the instrumentality of that special power plaintiff learned that instead of defendant's selling his stock at the prices mentioned in the account rendered by them, they sold it at a much higher rate; and although this is all positively denied by defendants and by the affidavits of several other persons, yet if the statement be true, and it seems to be the main issue in the case, that plaintiff's preferred stock were so marked that defendants could identify the same, and they knew at the time of selling that it was his stock, I would hold, as matter of law, that he is entitled to be credited with the full price received by them for the same. Under these circumstances, I would not be justified in depriving the plaintiff of any and every right to which in equity and in law he is entitled, to enable him to have a fair investigation, in open court, with witnesses there present, so that the proper doubt can be awarded by the court to testimony where it is merited, and where the plaintiff offers abundant security, thereby amply indemnifying the defendants, if they are successful. I see no just reason why I should not, in futherance of justice, sustain the preliminary injunction.

The plaintiff must give a new bond in $25,000, with good and sufficient sureties, indemnifying defendants against any loss in case he fails in the action. This, together with the securities now in the defendants' hands, will be abundant indemnity while they are awaiting the final action of this court.

J. LAROCQUE, *for defendants, appellants.*

*First.* The orders of the special term of the supreme court dissolving the injunction there, and of the general term affirming that order on the plaintiff's appeal, were made between the same parties, by a court of competent jurisdiction, and upon the same subject matter directly in issue there. The whole matter is therefore *res adjudicata,* and those orders are a bar to the proceeding by injunction in this court. (*Dwight* agt. *St. John,* 25 *N. Y.* 203; *Demarest* agt. *Darg,* 32 *N. Y.* 81; *Bangs* agt. *Strong,* 4 *Comst.* 315; *Ogsbury* agt. *La Farge,* 2 *Comst.* 113; *Mercein* agt. *The People,* 25 *Wend.* 64.)

Durant agt. Einstein.

I. It was decided at special term upon full consideration of its merits, as presented by pleadings and affidavits. That order having been affirmed by the general term, remains an adjudication upon the merits, notwithstanding that two of the judges in *banc* thought that the plaintiff had not even made a case by his complaint for an injunction.

II. It does not help the plaintiff that, for the purpose of endeavoring to escape from the effect of those orders, he afterwards saw fit to discontinue his action in that court. Those orders remain in full force and effect as adjudications, notwithstanding the discontinuance.

III. Such trifling with legal process, and seeking to make the rounds of courts and judges, in the hope of finding some one who would be favorable to his suit, and in the meantime obtaining the forced credit desired by thus prolonging the struggle, only makes the case worse for the plaintiff, and deserves, in addition, the severest reprobation at the hands of the court.

Such abuses will never cease until they are thus visited.

*Second.* The additional abuse was practiced, in this case, of taking possession of the securities, the sale of which is now sought again to be restrained, under proceedings for the claim and delivery of personal property; obtaining full counter security for their return by the defendants, if return should be adjudged; and when that proceeding failed in its design of embarrassing and preventing a sale, discontinuing it, in its turn, and commencing a new action for an injunction, by which the defendants have now again been restrained (without any fault of theirs on account of want of diligence) more than six months.

1. The plaintiff is estopped by his allegations in the claim and delivery proceedings, *claiming that he was entitled to the immediate delivery of the property, without any account or tender, and that it was wrongfully withheld from him by the defendants*, from now alleging that there was any embarrassment in the way of his availing himself of that proceeding. (*Code*, § 207.)

II. This is trifling with the solemnity of oaths, in addition to trifling with legal process.

*Third.* The case made by the present complaint for an injunction is no better than the one made in the supreme court, which was adjudged to be insufficient; and the grounds taken and sustained there are equally applicable here.

· I. The plaintiff claims, in his present complaint, that the defendants, when they sold his stock, had no right to sell.

II. They were then guilty of a conversion, and his proceedings by the provisional remedy for claim and delivery of the securities held as margin were, therefore, the appropriate remedy. (*Scott* agt. *Rogers*, 31 *N. Y.* 676.)

III. His allegations as to the land grant bonds, that they have "an actual and prospective value to the plaintiff much greater than the present market price thereof, and are not readily saleable, nor at all saleable at auction for such actual value," make no case for an injunction. The court does not grant injunctions to have the effect of a stay law preventing the collection of debts, nor to enable a debtor, owing a debt *in presenti*, to keep his property applicable to its payment, in order to take the chances of its prospective speculative value. If they have a prospective value greater than the present market value, he can redeem them by paying his debt, or buy them in at the sale to be made by the defendants.

IV. He had judicially approved security in the replevin proceedings which he voluntarily discontinued, *in double their market value, for their return, if a return should be adjudged at the end of that suit.*

*Fourth.* All the allegations of the complaint, on which the claim to the injunction rests, are fully and positively denied by the sworn answer of the three defendants,

directly responsive, swearing to matters both necessarily within their personal knowledge, and stated to be so. The defendants were, therefore, entitled to the dissolution of the injunction, in accordance with the settled rule on that subject. (*Blatchford* agt. *New Haven Railroad Company*, 5 *Abb.* 276; *Finnegan* agt. *Lee*, 18 *How. Pr. R.* 186; *Gould* agt. *Jacobsohn*, *Id.* 158; *Hoffman* agt. *Livingston*, 1 *Johns. Oh. R.* 211; *Roberts* agt. *Anderson*, 2 *Id.* 202; *Skinner* agt. *White*, *Court of Errors*, 17 *Johns.* 357; *Manchester* agt. *Dey*, 6 *Paige*, 295.)

*Fifth.* The written contract between the parties required no notice to be given to make good the margin when impaired, before selling. The plaintiff was bound to see to that at his own peril. The extraordinary fluctuations on the 24th and 25th of January are the best evidence of the wisdom and reasonableness of the defendants in absolving themselves from such an obligation, as they did by their contract. *Nor was any demand of payment of the loan necessary, nor could one be made—the sixty days allowed the plaintiff by the contract not having expired..* Repeated demands *were* made on the 24th and 25th for the increased margin to which the defendants were entitled by the terms of the contract, as is indisputably shown by the papers, and that was the only demand which could be made.

The judge at special term, throughout his opinion, confounds the idea of the necessity of a demand and notice of sale, as preliminaries to selling the Chicago and Northwestern preferred stock, with that of the necessity of such demand and notice before selling the land grant bonds and Pacific Mail Steamship Company's stock. The latter never have been sold. The very object of the injunction is to restrain their sale; and it is undisputed that demand of payment of the balance of the account was made, and notice of sale given of the latter, before the commencement of this action.

*Sixth.* By reference to the appeal papers in the supreme court, the court will see that the plaintiff, in that case, attempted by his complaint and moving papers to make out two "customs and usages," as applicable to his case; the one debarring the defendants, while pledgees of his stock, from dealing on their own account in stock of the same company; the other giving him until 2:15 P. M. of the 25th to take up his stock, in pursuance of what it suits him to represent as a "notice of intention" to take it up, given on the preceding day. He there procured the allegation of the applicability of this latter usage to the contract in this case to be apparently supported by the affidavits of witnesses. This was met on the part of the defendants, as will appear by reference to their printed brief in that court, "Point Fifth," and to those appeal papers at the folios stated opposite that point.

In the present complaint, the claim of the first usage is abandoned, apparently as untenable; but the plaintiff, with the same remarkable versatility in adapting allegations to suit the exigency, to which attention has already been called, *claims to have been entitled until 3 o'clock to take up the stock* (*this allegation being sworn to by his agent, Crane*); *and in connection with that, introduces the affidavits of the same witnesses who had testified in the supreme court, making it* 2:15 *P. M., one of those affidavits being again Crane himself.*

To this proposition the defendants answer:

I. No evidence of usage can be received to control or vary the clear and explicit provisions of the written contract in this case, giving the defendants a right to sell the instant that the margin should be no longer good. The claim that the express purpose of that provision can be defeated by the plaintiff, when called on under it to make his margin good, giving notice that he will take up some of his stock; and a delay of twenty-four hours thus obtained, is puerile.

II. For the purpose of seeing in what manner affidavits were procured in the former case, and how affiants took back what they had been made to appear to say,

when they came to understand it, it will be useful also to compare the affidavits of Howes and Norwood, read on the part of the plaintiff in that case, with the subsequent depositions of the same witnesses, taken on the part of the defendants, under compulsory proceedings; also those of Kohn and Minzesheimer, procured by the plaintiff (supreme court), with those of the same witnesses made after explanation of what was claimed to be the purport and effect of what they had there sworn to. Compare also Towar, supreme court, with same in this court. See, also, Winthrop and Fearing, in this court. The whole makes an overwhelming case aga'nst the plaintiff, on the issue thus raised by him.

III. It is to be borne in mind that, in the supreme court, the motion to dissolve the injunction was made on the defendants' answer alone, the defendants insisting that by the settled practice in that court, in this district, when so made, rebutting affidavits could not be read on the part of the plaintiff. (*See Blatchford agt. The New Haven Railroad Company*, 7 *Abb.* 322.) The learned judge of that court, at special term, however, departed from that rule; whereupon the affidavits so procured by the plaintiff were read, and leave was given to the defendants to rejoin, which they did by procuring explanatory affidavits of the plaintiff's own witnesses, among others. In this court, however, in which a different rule prevails, the affidavits on the part of the defendants were necessarily served with the motion papers, and the plaintiff was at full liberty to use on the hearing new affidavits not served; a liberty which he availed himself of by going through the same process with new witnesses which had already been gone through with *and neutralized* in the supreme court, as above shown.

IV. The new affidavits thus obtained by the plaintiff could, no doubt, have been as easily neutralized as the former ones, if there had been an opportunity. The whole evidence on this subject only serves to exemplify most forcibly the absurdity of testimony from laymen by *ex parte* affidavits, as to the legal construction of written contracts.

V. Instead of a " notice of intention to take up stock," what actually occurred was a *special promise to do so the first thing in the morning*, in consideration of the defendants' not selling on the afternoon of the 24th, as they had a right to do.

*Seventh.* The explanations given in the answer as to the hours at which the sales of the plaintiff's stock were made, viz., during the time while the second call of the first board was in progress, and during the interval between the first and second boards, and of the reasons why, from a desire to afford the plaintiff every opportunity to fulfill his promises of the day before, and redeem his stock, they were not commenced earlier, when higher prices were being attained, and why, of course, the market having gone on rapidly falling, and there being every prospect of its continuing to do so, they were not delayed after those promises had been broken, until the afternoon boards, when, as it turned out, somewhat higher prices were again obtained, relieve the case of all embarrassment from the published bulletins of the stock board of its earlier and later sessions, and from the affidavits accompanying them, even if the having obtained too low prices for the stock would be a ground for an injunction against selling the plaintiff's securities, which it would not.

I. It is distinctly sworn to that the stock sold during the second session of the first board even down to 56, and that the published bulletins by no means give all the sales which are made by parties in the room during the session.

II. All these matters as to the prices and the fairness of the sales are fully and amply corroborated by the affidavits of the defendants' brokers, procured after the case made on the part of the defendants on that subject had been attempted to be assailed on the part of the plaintiff in the supreme court.

Durant agt. Einstein.

*Eighth.* The defendants had a right to use the stock certificates, with powers attached, received by them from the plaintiff, on other sales made by them, so long as they always retained 10,000 shares in any shape applicable to the plaintiff's claim. This, it is distinctly sworn, they always did. The affidavits introduced by the plaintiff, therefore, that in some instances the certificates delivered on sales made for account of others than the plaintiff were the identical certificates received from him, amount to nothing. (*Horton* agt. *Morgan*, 19 *N. Y. R.* 170; *Saltus* agt. *Gennin*, 3 *Bosw.* 257.)

*Ninth.* All allegations of unfairness in making the sales, and of fraud in reporting sales made on account of others as sales of the plaintiff's stock, are fully rebutted by the answer and affidavits read on the part of the defendants. The judge, in deciding this cause at special term, treats the case as though it were enough that there is a substantial controversy to entitle the plaintiff to the extraordinary remedy by injunction. It is submitted that the rule is *directly the reverse;* and he must make it appear that his *equity is clear*, and his *necessity is urgent.* This is, in every aspect—as to the responsibility of the defendants, not here attempted to be assailed (although it was in the supreme court, with what result the papers there will show)—as to the absence of equity—as to the willful throwing away of full security for the protection of all legal and equitable rights by the plaintiff, after he had placed himself in a position to exact and had obtained it—as to the employment by the plaintiff of the process of courts for the purpose of accomplishing other than the avowed objects—as far, probably, from being such a case as any ever presented.

The suggestion that the defendants have sufficient security, even if true, is not entitled to avail the plaintiff. *Their right is to sell for the realization of their debt, and they are not to be deprived of it, especially when it is clear that they are abundantly responsible to make good any damage which the plaintiff may sustain.* (*Code*, § 219; *Willard's Eq. Jur.* 342; *Redfield* agt. *Middleton*, 7 *Bosw.* 649.)

*Tenth.* For these reasons the order below should be reversed, and the injunction vacated, with costs.

## C. TRACY, *for plaintiffs, respondent.*

I. The plaintiff has a clear right to bring this action for an accounting and to redeem the pledge of Land Grant Bonds and Pacific Mail Steamship Company stock.

(1.) The defendants are liable to account for their transactions in the preferred stock; for the sums advanced, sums received, sums collected, sales, prices and times of sales, &c.; and the plaintiff has a right to a judgment establishing a just balance as between him and the defendants.

(2.) The plaintiff has a right to the aid of a court of equity to redeem his pledge.

Although where there is no dispute about the amount due on a pledge, the pledgor may redeem by tendering the amount, or the pledgee may collect the amount by selling the property, yet whenever there is a dispute about whether anything or what amount is due, either party can come into equity to have the balance determined and the redemption or payment enforced (*Willard's Equity*, 456. "*An action in equity by the person to redeem the property pledged has frequently been sustained.*" *Hart* agt. *Ten Eyck*, 2 *J. Ch.*, 62, 100; 2 *Story's Equity Jur.*, 1031; *Curtis' Equity Precedents*, 88; *Equity Draughtsman*, 171.)

The plaintiff is ready to day, if he is found to owe, and to pay such sum if any as shall be found against him. But he denies that such a sum as the defendants claim or any sum, is due on the pledge. The pledge is merely a security for payment, and the plaintiff is content to leave the bonds and Pacific stock in the hands of the pledgees pending the action, and he adds further security by undertaking. It is obvious

equity that the court enjoin the defendants from selling the pledged property, at their own pleasure, while they have perfect security for anything which may be their due, and while they do not even bring a suit to assert or enforce their demand, in which the present plaintiff could contest the claim for a balance.

II. The accounting sought in this action relates to all the transactions between the parties on the loan in relation to the Chicago and Northwestern Railway Company stock, and includes the investigation of the defendants' sales.

The plaintiff impeaches those pretended sales on the following grounds:

(1.) The defendants, as pledgees of the preferred stock, had no right to sell it, unless the plaintiff had become in default to furnish margin, and the defendants, after such default had occurred and a reasonable time before selling, demanded payment from the plaintiff, or required him to redeem the pledge.

In the absence of special stipulations in the contract, it would be necessary not only to demand payment or redemption, but also to give notice of the time and place of sale. In the present contract notice of sale is waived, but demand is not waived. The defendants had no right to sell without first demanding that the plaintiff pay up and redeem the pledge. (*Cortelyou* agt. *Lansing*, 2 *Caine's Cases*. 200; *Wilson* agt. *Little*, 2 *N. Y. R.*, 443—448, *affirming S. C.*, 1 *Sandf., S. C. R.*, 361; *Lewis* agt. *Varnum*, 12 *Abbott*, 305; *Genet* agt. *Howland*, 45 *Barb.*, 560; *Milliken* agt. *Dehon*, 27 *N. Y. R.*, 364; *Andrews* agt. *Clarke*, 3 *Bosw.*, 585; *Merwin* agt. *Hamilton*, 2 *Duer*, 244.)

(2.) The defendants hastily sold the plaintiff's stock, without making any demand, or calling on the plaintiff to redeem, or giving him time to do so, after the alleged fall of price, requiring further security to keep up the margin.

No communication of any sort came to the plaintiff from the defendants, after the alleged fall of price, until the report was made of sales of the whole.

The plaintiff was not bound to anticipate a fall of price, nor was he bound to increase his margin, until a fall actually had occurred, and until he, after such occurrence, had been called on to make the necessary increase of margin, or pay off the loans and redeem the stock. (*Andrews* agt. *Clarke*, 3 *Bosw.*, 585.)

(3.) The plaintiff complied with every duty on his part under the contract, and at all times kept up the required margin of $10 a share.

While the shares stood in the market at 80, the margin was good according to the terms of the contract.

The contract was made January 11, 1867, and was to run sixty days, or till March 12th.

About January 20th, the stock declined below 80, and the defendants called on plaintiff for more margin, and he furnished $20,000 in cash.

January 23d, on a like decline he added $50,000 to the security.

January 24th, defendants called for more security, and plaintiff added $25,000.

Later on the same day, January 24th, after business hours, defendants called for more, and plaintiff furnished $20,494.

The plaintiff, at the close of that day, had the margin full and complete.

Later in that afternoon, he notified the defendants that he would take up 2,000 shares of the stock the next day, and pay the full price for it, *i. e.*, $140,000, and leave all the additional securities in the defendants' hands; which would provide for a further and large decline, if it should occur; and afterwards notified them that he would also take up further 3,000 shares, and pay for them (being $210,000), or as much more as might be necessary if a decline took place, and leave all the additional security in their hands.

The plaintiff made arrangements accordingly, and the next morning sent to the

defendants for the purpose of fulfilling what he said, and then obtained information from them·that the stock had been sold already.

These statements of the complaint are confirmed and supported by Mr. Crane's affidavit of the circumstances.

The attempt of the defendants to show a sort of notice to the plaintiff through Mr. Bunker, whom they call his "confidential clerk" is wholly refuted by Mr. Bunker's affidavit and Mr. Durant's affidavit.

(4.) The plaintiff having informed the defendants late in the day. that he would the next day take a part of the pledged stock and pay oft a corresponding part of the loan, he was entitled to a reasonable time to perform the transaction.

The defendants making no objection at the time, by their silence assented to the arrangement for the next day for the 2,000 shares; and if there should be a fall requiring the taking of the additional 3,000 shares, by the terms of the arrangement the defendants must let the plaintiff know their wishes and option.

The usage and custom gave the plaintiff most of the next day to perform the operation; and long before the time elapsed he was informed by the defendants of their sales being completed. The custom is well established.

(5.) The contract required additional security only when the "market price" should decline so as to reduce the margin below 10 per cent. Such "market price" is not determined by a few hurried sales made out of regular hours, but by regular sales on calls of the recognized boards, or at public auction. In this case no auction price is shown. The sales at the regular boards on the 25th of January were thus: Stock Exchange, first board, 60 to 61; second call on sale at 58½; second board, 64 to 64¾, closing price 64¾ to 65; open board, 10 A. M., 66 to 63¼; 1 P. M., 62 to 63½; 3¼ P. M., ·63⅜ to 62¼.

The "market price," therefore did not go so low on that day as to entitle the defendants to any more margins; and there was no show at all of such a fall of price before the defendants begun to sell under the pledge.

(6.) The defendants' report of sales was below the market price throughout. It shows no sale as high as 60, but gives several at 57, and one at 56½ and one at 56.

(7.) Many of the sales so reported were not sales of the plaintiff's shares, but of other shares, and some of the plaintiff's shares sold for more than is reported.

The plaintiff had not transferred his shares to the defendants on the company's books, but had lodged his certificates with powers of sale annexed, in the defendants' hands, and the plaintiff thus retained his property in the identical shares and certificates, and was entitled to a return of the same on the discharge of the loan. The defendants had no authority to mingle such certificates with other certificates or exchange them for other certificates. If the defendants would enforce the pledge by sale, they must sell the plaintiff's certificates; and if they made a sale of other certificates it cannot be reported as a sale of the plaintiff's pledge.

The case may be different where the shares of many proprietors are posted into one account on the stock ledger, and the broker has no means of distinguishing the shares of different customers. In the present there was no confusion of shares, but a clear and precise certainty of certificates. (*Saltus* agt. *Genin*, 3 *Bosw.*, 240—257; *Horton* agt. *Morgan*, 6 *Duer*, 56; *Allen* agt. *Dykers*, 3 *Hill*, 593; *Nourse* agt. *Prime*, 4, *J. Ch. R.*, 499.)

III. The fact that in another action for different relief, but based upon a statement of facts similar in many respects, the supreme court dissolved an injunction, is no bar or defense to the proceedings now pending.

(1.) That suit has been discontinued.

(2.) The determination of a motion within the discretion of a court never controls the rights of parties when they appear in a different action or court.

(3.) .The erroneous decision of the motion by the supreme court grew out of the practice there established of refusing to hear affidavits in support of an injunction, when the defendant moves to dissolve it on a verified answer, without other affidavits.

This court holds the contrary rule. (*Fowler* agt. *Burns*, 7 *Bosw.* 637; *Hoffman's Pro. Rem.* 351, 360, 361.)

The practice of this court prevails in all the districts of the supreme court except the first. (4 *Abb.* 282; 8 *Barb.* 17; 1 *Code R.* 114; 4 *How.* 225; 5 *How.* 265.)

The Code clearly treats the sworn answer as an affidavit, because, if it were not so considered, it could not be used as ground of the motion. (*Code*, §§ 220, 222, 226.)

IV. It being impracticable in the present case to decide, on a non-enumerated motion, upon affidavits, all the issues joined by the pleadings; and the court at chambers, on full hearing, having increased the security and continued the injunction until trial; and the dissolution of the injunction being fatal in the right of the plaintiff to reclaim his shares, if he succeeds on the trial; and the cause being already referred for trial; the order appealed from should be affirmed. (*Carpenter* agt. *Danforth*, 19 *Abb.* 225.)

*By the court,* ROBERTSON, Ch. J. The professed object of this action is to redeem certain securities in the hands of the defendants, upon paying the amount due thereon, and as incidental thereto, to obtain an order restraining the defendants from selling such securities until an account can be taken of the amount due the defendants. It is essentially, therefore, an equitable action, and must be governed by the well settled rules of equity jurisdiction; and if it cannot be maintained under those rules, the injunction order appealed from cannot stand.

A court of equity has no general jurisdiction over actions to redeem personal property pawned, without some other circumstances rendering its interference necessary. (*Glennie* agt. *Irwin*, 3 *You. & Coll.* 436; *Hirst* agt. *Peirse*, 4 *Price*, 339; *Jones* agt. *Smith*, 2 *Ves. Jr.* 272; *Demenbray* agt. *Metcalf*, 1 *Vern.* 698.)

The remedy at law is ample, by tender of the amount due and a possessory action to recover the articles pledged, or damages for their detention. (2 *Story Eq. Jur.* § 1032.) It is true, as laid down in *Hart* agt. *Ten Eyck* (2 *Johns. Ch. R.* 100), that bills to redeem pawned personal property have been sustained, but only in cases where either no objection has been made, or an equity arose out of other circumstances,

and all the cases cited in the last case as authority are of that kind. (*Kemp* agt. *Westbrook*, 1 *Ves.* 278; *Demenbray* agt. *Metcalf, Prec. in Ch.* 194; *S. C.* 2 *Vern.* 698; *Van Der-zee* agt. *Willis*, 3 *Bro.* 21. Certainly such an action would not spring out of any of the great sources of equitable jurisdiction.

The only ground of equitable jurisdiction over an action for the redemption of personal property pledged, besides the necessity of a discovery, and perhaps an assignment of the pledge, is the necessity of taking an account. (2 *Story Eq.* 1032, *and cases cited in note*.) It is of course not necessary to discuss how far the union of both legal and equitable jurisdictions in one court, and the right conferred on either party to an action to examine the other party as a witness (*Code of Procedure*, § 389), has taken away a jurisdiction dependent solely on the right of discovery, as there is no pretence in the complaint or elsewhere of the necessity of any such discovery. There remains, therefore, in this case, but the ground of some necessity of an account being taken, as in a court of equity, to enable the plaintiff to sustain his action.

It is fully settled that the *account* on which equity bases its jurisdiction must be really one; that is, not having only one item on one side and a number of set offs on the other, but a series of transactions on both sides. (1 *Story Eq. Jur.* §§ 458, 459; *Porter* agt. *Spencer*, 2 *Johns. Ch. R.* 171; *Moses* agt. *Lewis*, 12 *Price R.* 502; *King* agt. *Rossett*, 2 *Y. & Jer.* 33; *Dinwiddie* agt. *Bailey*, 6 *Ves.* 136, *and Wills* agt. *Cooper, cited therein; Padwick* agt. *Hurst*, 16 *Beav.* 575; *Phillips* agt. *Phillips*, 9 *How.* 471.) In this case, the claim on the part of the defendants can only consist of one item, to wit., the original advances by them, or so much of it as remains unpaid. Every sum paid or to be credited in that account, set out in the complaint, forms a subject of set off in an action at law, including even any liability of the defendants for selling any of the originally pledged stock

below its market price; for that is a subject of counter claim, in an action for the loan, under the first subdivision of section 150 of the Code of Procedure, as either *arising out of the contract or transaction which would be the foundation of such action,* or *connected with the subject of the action,* and as available in the court acting as a court of law as one of equity.

There is perhaps still less reason at this time for preserving, or rather extending, jurisdiction, to give affirmative relief to a debtor in such a case of a one sided account, since the enlargement by the Code of the cases in which references of all the issues may be ordered, wherever a long account is concerned, the increase of the power of all courts to order the production of books and papers summarily, and the conferring upon every suitor of the right of examining the adverse party as a witness, whatever the case may be.

So far from any discovery by the defendants being shown to be required, the plaintiff sets forth in his complaint various defects in the sale of the stock originally pledged, not merely as derived from the information of others, but as matters of his own knowledge, although he escapes all responsibility for the statements by not verifying them under his own oath.  They are as follows:  An entire failure to sell some shares of stock represented by the defendants in their report to the plaintiff of sales to have been sold, and sales of some at less than the market rate, and of others at higher prices than those stated in such report.  He does not, however, as he was bound to do, in order to render his complaint sufficiently definite and certain, state the numbers of such unsold shares, or of those sold too low, or those whose prices are not properly accounted for.  In the affidavits, however, presented on his behalf, he establishes what he considers to be such amounts, without the aid of any discovery from the defendants in regard to them.

Even assuming, however, that a court of equity will restrain the sale of pawned personal property until an

account can be taken of the amount due on the loan upon them, under the same circumstances as it would a suit at law, the validity of the sale by the defendants of the stock in this case originally pledged is not one of such circumstances. If the sale was valid, the account to be taken is reduced to the original loan on one side, and on the other, the payment of two sums of $20,000, and $10,000 before, and the receipt of interest on the land grant bonds collected, less the government tax ($33.25), and the amount of a note for $25,000, since the commencement of this action.

To ascertain the amount due would in such case be a matter of mere clerical computation. If, however, one of the objects of this action be to attack such sale, and endeavor to make the defendants liable in damages for the conversion of such stock without authority, they could not, until liquidated in an action, form any part of an account, such as is prayed for in this case. Nor would the court be authorized to tie up the defendants from using their legal authority as pledgees, bestowed on them by the plaintiff, until the amount of such damages could be ascertained.

I shall therefore dismiss from consideration all the allegations in the complaint, and all the evidence before us, tending to establish any invalidity in such sale, as wholly superfluous and irrelevant, if not suicidal, in determining whether this action can be maintained upon such a basis as to warrant an injunction. The complaint does not clearly and distinctly either avow or disavow such sales as being made by authority, although it apparently does the former by claiming that, in the account which the plaintiff professes therein his readiness to have taken, that the defendants shall be charged with the market price of the stock sold, and the full amount received by them therefor, and not allowed the benefit of any pretended sales of stock; notwithstanding it also prays that the defendants may be charged in an accounting with all loss suffered by the plaintiff by the *unlawful* disposition of such stock. It might with equal propriety have

sought that damages for selling any other stock without authority should enter into such account. Indeed, the only grounds suggested for attacking the validity of such sales were that the market had not so fallen as to create the contingency on which the right of sale arose, and that no demand was made for further *margin*.

In regard to the first, the evidence as to a fall on the 25th of January, the day of sale, is not conflicting; and in regard to the last, the contract before us does not require such demand to be made as was required by that in *Milliken* agt. *Dehon* (27 *N. Y. R.* 364), which case in fact rather holds a demand for the amount due not to be necessary, when a right is given to sell either at public or private sale, which *a fortiori* is applicable to this case, where a right of notice is expressly waived. The reasoning of Justices WRIGHT and MARVIN, in the case last referred to (*Milliken* agt. *Dehon, pp.* 370, 374), in regard to the impracticability of notice of time and place of sale of articles of such rapidly fluctuating value as stocks, is equally applicable to a demand of payment or more security, which seems to have been *purposely omitted* in this contract. At all events, unliquidated damages for an entirely unauthorized sale can form no part of an account to give jurisdiction to a court of equity.

Of course, the plaintiff is entitled to the benefit of any originally pledged stock which remains unsold, notwithstanding the written report of the defendants to him to the contrary. But I am at a loss to know how any failure to sell it would aid him in a mere *accounting* between him and the defendants to be had in this action. Such an *account* would not be affected except by the receipt by the defendants of some sum as the proceeds of an authorized sale of shares of stock. If they were not sold, the debt of the plaintiff would be so much the larger. A mere representation by an account of sales, that stock had been sold, when it was not, would by itself furnish no ground of equitable interference. The plaintiff claims to have

detected the falsehood, and furnished in the affidavits before us evidence of it, without the necessity of an examination of the defendants. That evidence, if important, would be equally available in a trial at law, and no mere discovery would ever have been necessary.

Sales of the stock below the market price, when duly authorized, would not make the defendants liable for the difference, unless made with intent to injure the plaintiff beyond the mere realization of the amount due the defendants, as in other cases of abuse of lawful authority. (*King* agt. *Parks*, 19 *J. R.* 375; *Butts* agt. *Edwards*, 2 *Denio*, 164; *Baldwin* agt. *Weed*, 17 *Wend.* 224.) But something besides a mere sale below the market price is necessary to show such intent.

The defendants are mere pawnees, were not bound to use even the same diligence as an agent to obtain the best price. The latter would not be held liable except for extraordinary negligence, which must be proved, not presumed. There must, at least, be such recklessness shown in the mode or time of selling as to establish an intent to injure the pawnors, before the pawnees can be made liable for any loss. The complaint, indeed, avers that the sales below the market price were made by the defendants "out of the usual course of business, and in a manner *designed and intended to depress the price and produce less than the market value*, and which tended to and did produce that result." But the only verification that allegation has is an affidavit by the agent of the plaintiff (*Crane*), that he believes such matters to be true, from having seen reports of sales at the stock exchange and board of brokers of that day, and been informed by persons named as purchasers in the report of sales rendered by defendants of prices paid by them, and the numbers on the certificates of stock received by them. This certainly is not sufficient to establish a design to obtain a less price than the market value, either to injure the plaintiff by such sales or for any other purpose. Such allegations in the complaint

Durant agt. Einstein.

are fully denied by the defendants in their answer, verified by their oath; and there is no other evidence before us of any such intent or its result in such sales.    On the contrary, the agents of the defendants in selling deny it.  Consequently such allegations in the complaint, so verified and denied, furnish no ground for continuing the order of injunction in this case.

The remaining objection in the complaint to the account rendered by the defendants of the sales by them of the originally pledged stock, of the receipt of larger sums as the prices of some of them than those stated in such account, the plaintiff claims to have discovered by other means and sustained by ample evidence before us, without any discovery from the defendants.  If so, the details are all given in the affidavits furnished on his part, and there would be no difficulty in establishing the set off by way of defense, in an action at law, to the full extent of the sums kept back.

The whole account between the parties, to be taken in this case, upon the plaintiff's own showing, will be reduced to the original advance by the defendants on one side, and on the other cash payments made by the plaintiff, interest on the land grant bonds and amount of the Pacific Company's note, received by the defendants, and the price of the shares of the originally pledged stock actually sold by them, omitting from such account (for reasons already given) all excess of the market value beyond such price, and all sums pretended by the defendants to have been received by them in any of the sales claimed by the plaintiff to be fictitious (if there were any such).   So simple an account, requiring mere computation of figures, is not of such a character as to require the aid of the equitable powers of the court to unravel it.   Nor should the defendants be delayed in using the means placed in their hands by the plaintiff to collect the amount due them, according to the plaintiff's contract, until this action is reached on the calendar, to be tried, or a referee can be called in to make the computation, and a

decree made.for redemption, which the plaintiff may perform or not, as he pleases.

Were it necessary, in order to justify a vacation of the injunction order in this case, to go beyond the questions of the jurisdiction of this court to sustain this as an equitable action, and the incompatability of the nature of the account to be had under any state of facts shown by the plaintiff, with any necessity warranting the exercise of such jurisdiction, a further justification would be found in the denial in the answer of the equities of the complaint, and in the affidavits of the brokers of the defendants, who actually sold the preferred stock, as opposed to that of the plaintiff's agent (Crane), who testifies solely to information derived from the purchasers. *Prima facie*, the denial in the answers of the defendants of the equities of the complaint ought to entitle them to a vacation of an injunction order (*Blatchford* agt. *N. H. R. R. Co.* 5 *Abb.* 276); but the affidavits on the part of the plaintiff being admitted, those on the part of the defendants rebutted their effect. The plaintiff was undoubtedly bound to make out his case affirmatively, and although this court on appeal at general term cannot properly interfere with any decision at special term, founded on conflicting evidence, it yet may do so where that on one side is mere information and belief, and that on the other positive knowledge. The apparent discrepancies of the affidavits of some of the witnesses on the part of the defendants, when made in the action in the supreme court, seems to be explained by them. There is also some discrepancy in the testimony of the witnesses as to the market value of the stock in question on the day it was sold, but that may originate in their knowledge of different sales, and is not sufficient to warrant the conclusion of an undue sacrifice of it by the defendants for sinister purposes. The testimony of the defendants' brokers (*Towars, Kohn, Minzesheimer* and *Ellery*) is positive as to the sales of stock by the direction of the defendants, and the prices obtained therefor, which correspond with the account

rendered by the latter to the plaintiff. The defendants swear that all sales made of such stock by such brokers for them, before a quarter before twelve o'clock, noon, were not made on behalf of the plaintiff; and the plaintiff's agent (Crane) is made to testify whether some of the sales made at a higher rate than was reported by the defendants was of the plaintiff's stock. Upon such evidence, the plaintiff has hardly made out a clear case of sales at higher prices, or of any design by the defendants to lower the market value; and the mere fact of reporting fictitious sales is not sufficient to sustain the injunction order.

I am inclined to think, if material in this case, that the plaintiff is not bound in it by the decision of the case in another court between the same parties, upon a similar state of facts. In that, the plaintiff claimed an illegal sale of the stock, and demanded its restoration in *specie,* by way of an equitable substitute for the remedies formerly known as actions of trover, detinue or replevin. An injunction was of course properly refused in it. The plaintiff subsequently discontinued that action, and attempted one of claim and delivery upon the same ground of an illegal sale, and finally abandoning that ground, has chosen this one in its present form for an accounting, recognizing all the sales actually made as valid, but claiming more as to the sales of some than the defendants are willing to admit. By this action he has succeeded, by giving security instead of making a tender, and paying the money into court, or bringing a possessory action, in obtaining delay by an injunction order. It may possibly be hard upon the plaintiff to be driven to an action for damages, or for his stock, or, perhaps, rather more convenient, to abide the delay of a suit, before paying the amount due on the original loan; but that should have been considered when he made so stringent a contract, giving the defendants so much authority. The individual hardship, however, is not to be weighed against the danger of the

abandonment of well settled legal principles, as to the only cases in which such hardship can be relieved from.

The order appealed from should be reversed, and the order enjoining the defendants vacated, with $10 as costs of the motion to vacate it.

No costs are given on the appeal.